The next case on our calendar is Virginia Properties v. T-Mobile NE and Canby Design Group. We'll hear from Virginia Properties. Good morning, Your Honor. Kenneth Lee for Virginia Properties Appellant. We're here today to review one of the largest sanctions awards in the Sutherland District. And it is our position that this award is not consistent with the law of the circuit and certainly not consistent with the factual record. I would like to begin by pointing out a few key themes that were the underpinnings of the sanctions order that we believe are contrary to the factual record and show that this was in fact an abuse of discretion by the district court. And then after that I would like to discuss some of the law applicable to this case including the Supreme Court's recent decision in Goodyear and how it applies here. Was this a decision made before Goodyear was handed down? Yes, Your Honor. This court has held that while a certain amount of deference is indeed accorded to the district court with respect to its inherent authority to issue sanctions, this court must also ensure that such decisions are made with restraint and discretion because the consequences to the parties and the litigants can be quite severe. In this case, that's certainly true. This sanctions award is over $600,000 in legal fees which constitute the totality of the legal fees by the opposing side as well as a non-party since the inception of the case, a punitive sanction of $75,000 payable to the district court, and in addition to that, dismissal with prejudice of all of the plaintiff's claims. One of the key themes that appears to underlay the district court's sanctions order is the district court's belief that Virginia Properties was responsible for quote, apparent forgeries of documents produced in this case. And a forgery is a... What was the forgery? Weren't all the documents, the two estimates prepared by the engineer? That is correct, Your Honor, and that is precisely our point that there is absolutely no factual record. There's no evidence to support in the record that any of the documents produced by Virginia Properties in this case were forgeries. But the second estimate was not turned over timely. Isn't that correct? The answer to your question is that the, and I will get to this, but the answer is that for the documents that were in existence as of the commencement of this litigation, they were all turned over by Virginia Properties to its trial counsel on a timely basis, and the trial counsel was responsible for making the production. Except the 9-point memo, which was never turned over, right? The 9-point memo was not found in the files of Virginia Properties, and so there's no evidence that Virginia Properties withheld it or did anything. They simply were not turned over in the search of the files. And Mr. Yen's testimony was equivocal on whether he sent it or not. He said he thought he sent it, but wasn't. That's correct. There's no dispute that Mr. Yen created both versions of the document, and he's not sure whether he sent it. I'm sorry, Judge, but it's the 4-point memo that Judge Hellerstein thought was forged, right? It appears so, but part of our point, and it's noteworthy that T-Mobile and its briefs does not defend the judge's characterization of any of these documents as, quote, apparent forgeries, because they are also aware that it can't be the case. What the judge appears to have determined were, quote, forgeries are instances in which a document is repaired in several different versions for several different purposes. And the testimony is quite clear in this case that given the nature of the repairs that were being done on the building, Virginia Properties was aware from the beginning that there were going to be issues about which of the repairs were properly reimbursable by T-Mobile, because they were caused by the collapse of the antenna on Virginia Properties' roof, and other repairs that were done which were not allocable. I'd like to know whether you are arguing that there isn't enough on this record so that the district court could find that your client and not the lawyer did various things which were wrong, backdating, coming in with a claim for the same amount of total damages as were only partially due to the defendant's in the case doings, and all of those things. Are you arguing that there isn't enough to find that your client did things which were wrong, or are you arguing that given what was found to be wrong, the sanctions were disproportionate to it? I'd like to know which it is, because you're kind of going back and forth between these things. So that I may be clear, we are arguing the first argument, Your Honor, that there is not enough evidence in the record to suggest that Virginia Properties was doing anything deceptive, anything in bad faith. It's a remarkable argument to make, given the backdating evidence, the evidence between the four and the nine, the evidence that Mr. Yen, the architect, then brought in, the evidence of what you put in your complaint and the amount of money that was there as against the total damages. I think that's a remarkable argument to make that the district court could not have found within its discretion that your client did a heck of a lot which was wrong. The question of whether the sanctions, and specifically under Goodyear, whether all of the attorneys' fees, the question of the $75,000, fine. That's a question which might be discussed. The question of whether the dismissal of a whole suit when part of a suit seemed to have merit. Again, those are things which might be talked about, that the notion that the district judge couldn't find that your client did a heck of a lot that was wrong. I find that a remarkable argument. Your Honor, I want to address all of those issues if I have time to do so, but it is absolutely a core underpinning of our position that the district court has completely misconstrued the record in this case. And while, as I said, it is afforded some discretion, it does need to match up the record. Simply producing two versions of the document, one of which has all of the expenses and another one has just the expenses attributable to T-Mobile does not make it a forgery. As a matter of fact, if you were going to try to mislead the other side, you'd just do one and say, here it is, pay for all the damages, right? The only reason you would do two is to distinguish between damage that was caused by T-Mobile and damage that wasn't caused by T-Mobile. That is the case, and that's exactly what happened. Moreover, all of these versions, multiple versions, were turned over by Virginia Properties to all of its trial counsel, and to the extent that there are any problems or delays in production, those can only be held to counsel. They cannot be held to Virginia Properties. Judge Calabresi asked about backdating. Is there any evidence of backdating? There is a submission to the City of New York that was made in 2014, and one of the requirements is an agreement for the original construction, and there was an agreement that was created and backdated to the original date of construction because the document was not in existence in the form. However, there's no evidence that anything in the document was inappropriate or incorrect. In fact, it was simply an attempt to memorialize an agreement that had taken place earlier when the construction commenced. Let me ask you to address what I think is, at least from my view, the most troubling piece of the record with respect to your client, and that's the October 4th email from Spring to Kulik that says, let's confuse them as much as we can, in essence. What do you say about that? The email is certainly not anyone's favorite email. It also does not prove that Mr. Spring was instructing Mr. Kulik to lie, to deceive anybody. There was obviously a very heated discussion, and I think that the emotions probably got the better of him, but again, nothing in the record points to the notion that what the court has concluded was that the true damages, in his own opinion, were only half of the amount of the claim damages. That's not the kind of determination that should be the underpinning of a sanctions motion which is this far reaching. If I may touch on . . . Can I address a moment on that? The fact that the total damages that were done were the same amount as what was claimed of the defendants when now it is admitted by everybody that only part of it was due to the defendants? That the figure was surprisingly similar? Yes, and the reason is because those two documents were prepared for sort of an apples to oranges comparison. The document that is sent to the city and the state looking for tax abatements and for rent stability increases allows them to put in subject matters that are not related to the T-Mobile actions, such as there was a boiler that went into there. At the same time, there are other kinds of things for which one cannot recover, such as scaffolding, which were omitted from that submission. So the submissions are not intended to be exactly apples to apples. I know. The fact that the total figure comes out to be the same is what is peculiar. It looks as though you're climbing for the whole thing. I mean, I understand. Look, if one had been 600 and the other had been 450 and the actual there were 300, that would be a different thing. But when the two figures are exactly the same or just about exactly the same. And I think it speaks to the fact that that would be an entirely appropriate cross-examination issue at a trial to a trial effect. But given the stakes at the sanction stage, to completely dismiss all of the claims and assess these kinds of sanctions plus the 75 punitive sanction, I think is not defensible by this record. And the two numbers were not exactly the same, right? There were some things that were added in and other things that were subtracted that were roughly the same amounts, right? You are correct, Your Honor. Thank you, counsel. Thank you, Your Honors. You've reserved three minutes for rebuttal. Yes. Thank you. Good morning, Your Honors. May it please the Court. Roberta Kaplan from the Paul Weiss Firm for T-Mobile. Robert Spring, the managing member of Plano Virginia Properties, owns a bunch of buildings in New York City, including the one at issue in this case, which is a six-story apartment building on Virginia Avenue in the Bronx built almost a century ago. It's not exactly a luxury building. In the last seven years alone, its tenants have lodged more than 70 complaints with the city relating to mold, asbestos, and other unsanitary conditions. In fact, based on official New York City data, the building has received the worst possible rating by the city, or an F. In 2012, Plano decided to conduct extensive repairs to the roof and facade on all sides of the building. The cost of those repairs was $692,102. I'm just going to say $692 if that's okay with you, Your Honors. Was it after T-Mobile put its stuff on the roof? The stuff had been on the roof for quite a long time, Your Honor. When were they put on? They say it takes about 350 square feet. It's in the southeast corner of the roof. If you look at the complaint, Exhibit Y to the complaint, which is in the record, is Joint Appendix 909. There's a pretty good picture of the corner of the building. Everybody agrees that that equipment caused some damage to the building, right? T-Mobile from day one, and this is relevant to the Goodyear factor, Judge Calabresi, has been willing to pay any amount with respect to damage T-Mobile caused to the roof. In fact, made several settlement offers, some presided over by Judge Helsey at the beginning of the case. That may well mean that under Goodyear, ultimately, you are able to get all of the attorney's fees if we decide that their sanctions are proper in the first place because it may be that there would have been no attorney's fees because there would have been a settlement because you would have offered to pay, but that isn't for us to say. That would be something for the district court, and under the Supreme Court's decision in Goodyear, what was done by the district court was incorrect. That's correct, Your Honor, but Judge Hellerstein made that precise finding, and the site for that is, one second, Your Honor, the site for his finding on that is S.P.A. 3. He said he made the finding that at the beginning of the case, he actually presided over that. Yes, but he made a finding of that sort under an understanding of the law, which was before the Supreme Court said, where a but for . . . Look, if that is so, he will simply go back and make that finding, but . . . I understand, Your Honor, but with respect, that argument was made, the Goodyear argument was made by the lower court, by this law firm. We cited it in our 20HA letter, in the 20HA submission, and Goodyear is not exactly new law. This concept of needing requiring but for causation, as we cited in our letter, has long been the principle. It's not stating a new principle by the Supreme Court. Let me ask you . . . Counsel, when I interrupted you before . . . I apologize, Your Honor. No, it's not your fault. I asked . . . you were about to talk about the repair of the roof, which already had T-Mobile's equipment on it, and T-Mobile's equipment had already caused some damage. Is that fair? I think when the report was made by Mr. Spring, right before he filed the case, T-Mobile did not deny that it is certainly possible that its equipment could have caused damage. T-Mobile does and would deny, had we ever gotten to that point, that its equipment caused a brickwork repair. It's almost like labor law 111, but didn't apply to this building, but brickwork repair to the entire building, which was done. It would contest that the entire roof surface needed to be done based on the T-Mobile work, which was part of the $692,000. Those are damage questions, though, right? No, they're not damage questions, because this is not a case in which someone makes a complaint and just says, you damaged me in an amount to be determined by an expert. These documents with $692,000 were attached to the complaint. They were part of . . . if you look at Exhibit J, attached to the complaint in April 13, it has nothing about the repairs that we know that were done about brick pointing or waterproofing. It's not on the document. And not only that, Your Honor, this client was subject to Rule 26 disclosures. And under 26A, all they relied on were the documents submitted to their complaint. So you might be right, Your Honor, if someone said in an amount to be determined by experts. But he came in on day one and said that all of this work was attributable to T-Mobile. He denied . . . he left off the documents, the work that was actually done, that we showed in our complaint was the actual cost. So fraud permeated this case from day one. And I agree these sanctions were high. But in a case in which a plaintiff submits a complaint in which documents are fraudulent from day one . . . What documents were fraudulent? Exhibit Y to the complaint, which is JA-909. What is it? That is the drawing that's supposed to show the work that was just done to the building. That's completely contradicted by the detailed architectural drawings that were later produced in discovery. The four-point report of Mr. Yen attached to the complaint . . . How is that fraudulent? Because it purports any person reading this document would assume that these were all the repairs that were done to the building. And that was what constituted the $692,000. Didn't Mr. Yen testify? Isn't that the . . . I'm not done. I'm sorry, Your Honor. The cost estimate attached to the complaint is exhibit J, which is JA-67, which comes to $692,000. And you're saying those documents are fraudulent because they're overreaching. They're asking for more than the actual repairs related to the T-Mobile work. They have nothing to do with the repairs related to the T-Mobile work. We know what the $692,000 costs, because we have later documents. It includes brick pointing, waterproofing, and lintel work. And they're not on these documents. But there is some damage attributable to T-Mobile, isn't there? Presumably there is, Your Honor. But when someone files a complaint and seeks to recover $692,000 and attaches documents with a $692,000 figure that does not . . . that consciously omits the actual work that was done, that is a sanctioned conduct. Let me ask you, why, even given what you are saying, wouldn't the appropriate sanctions have been the legal fees that were rendered necessary by this . . . and we don't know whether that $75,000 was one or the other. But, why does it justify the dropping of the whole complaint when part of the complaint was so clearly correct that you had, in fact, offered to pay it? There's no part of this complaint with these documents attached to it, in which described the work that was done, that is clearly correct. If this . . . I understand that, but I'm talking about a sensible set of sanctions. Why isn't a sensible set of sanctions saying, you have made these people spend a lot of money on lawyers' fees, and that you must give back? And we'll figure out what that is, whether it's the whole or not, now under Goodyear or whatever, and maybe you already did that. But that . . . and you've taken the court's time, assuming that that's what the $75,000 is rather than a fine, or if it is a fine, what protections there are for it. But, why does that cause a $300,000 approximately of genuine damages that these people have been . . . did suffer on account of actions by your client to be somehow . . . And, when someone does what this plaintiff did in this case, and comes in and files a document permeated with fraud, and then keeps it hidden for two years, and then submits documents to the city and the state to get a windfall, to get a . . . He got a rent increase from his tenants that exacerbate the fraud. The district court was well within its inherent authority to say, no can do, in fancy legal terms. And to say . . . You are not permitted to file a complaint like that. And to say, I'm going to charge you $300,000 for doing that? Well, first of all, he's not out any money, because he's getting the rent increases from his tenants. That's what the MCI application is about. But, that goes to the damages, the things he did. But, why with respect to the amount that you did, and that you are responsible, should that disappear? Why shouldn't you get a windfall? Because you are getting a windfall, because you don't have to pay for the damages that you did, because of it. That's why I'm trying . . . I'm more skeptical than perhaps some of my colleagues about whether what they did was sufficiently fraudulent or not. But, in the end, I always come down to, you know, what is a sensible set of . . . I think . . . Or did the court just get mad? I think the implication of that, Judge Calabresi, is essentially that dismissal would almost never be appropriate . . . as a sanction for fraudulent conduct and abuse of the judicial process of the like that happened here. I don't think that either the Supreme Court or this Court's cases say that. And, while I agree that the sanction here was severe, the conduct that it sanctions was severe. And . . . Doesn't this amount to a windfall for T-Mobile, since they admit that there was damage to the roof? T-Mobile is not paying, pursuant to this conduct, for any damage to the roof that was done. But it caused. But the plaintiff also got a windfall, Judge Pooler, because the plaintiff applied for a rent increase for $692,000 to the city . . . and got that rent increase approved. So, over the next four years, his tenants will actually be paying that amount anyway. So, you're right, there's questions of windfall here. But, I think you have to look at both sides of the equation about windfalls . . . which is one of the issues that very disturbed the District Court below. Can I ask about . . . One of the things that concerns me an awful lot about what Judge Hellerstein did is this four-point memo . . . that he says was clearly forged and that Mr. Spring added things to it. Mr. Yen testified. And, I think he made that finding based on what was submitted to him by Mr. Rapoport. Do I have that name right? Yes, Counselor Bellow was Mr. Rapoport. Yeah. So, and I'm concerned, quite frankly, about what Mr. Rapoport represents to Judge Hellerstein. Mr. Rapoport says that the four-point . . . the difference between the nine-point report and the four-point report is problematic. That Yen didn't actually draft the four-point report because he backed away from it in his deposition. But, I don't see where he backed away from it in his deposition. And, at page 2438 of the Joint Appendix, he says he typed that four-point report and it was all his language. What's the basis for finding that that was forged? The finding . . . I think the finding is essentially that it's fraudulent. And, the reason it's fraudulent as the way it was portrayed in this case is that Mr. Yen testified under oath that in the four-point report, only the first . . . excuse me, in the nine-point report, numbers one through seven had absolutely nothing to do with T-Mobile. Right. Yet, only the four-point report, which purports to describe really only one thing that overlaps and has to do with T-Mobile, was attached to the complaint. But then, when you tie the numbers throughout the case, and this was very important to Judge Hellerstein, when you tie the numbers through the case for the actions that were done in the nine-point report, those tie out to $692,000. I understand. But, he says that the four-point report, in the district court's words, includes additions not found in the original report, apparently inserted by Spring or his agents after Yen prepared the second report. What's that base value? I think what he's suggesting is that the nine . . . they were both dated the same day. The nine-point report was never produced. We didn't even get it from Mr. Spring. We got it from a subpoena to Mr. Yen, which is quite disturbing. So, if they're not forgeries, why wasn't it submitted in 26A disclosures in this case, which it was not? Didn't he say he gave it to his attorney? Does who? Mr. Yen says he believes that Mr. Spring saw it. When Mr. Spring was shown it in his affidavit, he says, yes, I believe I've seen this before. He never provided it to his attorney because he says he didn't have it in his file, right? No, Mr. Yen had it in his file. Right. Mr. Spring didn't have it in his file. Mr. Spring first said that he'd seen it before. Right. And, Mr. Yen said that he believed that he gave a copy to Mr. Spring. But, to answer my question . . . And, regardless, Your Honor, I practice civil litigation all the time. In a 26A disclosure, when there's two documents like this, both of them need to be produced. And, if it's not in your attorney's files, then you call your attorney and you say, why hasn't that document been produced? That's what lawyers do day in and day out. Unless they don't have that document. No, you knew about the document. The document was written to the contractor who did the work. There's a question about whether Mr. Spring ever had that document, right? Mr. Yen says he thinks he sent it to him. Mr. Spring didn't have it in his file. Mr. Spring said he saw it. Okay. And, the document is material to issue on the work. Okay. And, when the attorneys . . . and this is truly the extraordinary thing about this case. In defense, what does Mr. Spring say? He says, it's all my attorney's fault. But, his attorneys all say that Mr. Spring lied. His first attorney said he lied. His second attorney said he lied. And, his third attorney, Mr. Chabela, admitted that he lied in backdating the rent increase application. That's extraordinary. I agree that these sanctions are extraordinary. But, that is extraordinary. They said that as part of a proceeding designed to determine whether they would be responsible for this, right? I'm sorry, Your Honor. I didn't understand the question. When they submitted those affidavits, the judge was looking at them as possibly being responsible for what he saw as discovery abuse and fraudulent provision of documents. He was looking at the attorneys and they said, not our fault, he lied. Let's take them apart. So, Mr. Chabela, the last attorney, admitted that he lied in backdating the rent increase application. I'm going to go backwards in time. The second attorney, Mr. Markowitz, Mr. Spring, in order to defend himself, said, these attorneys told me that the rent increase and the tax abatement documents were not relevant. That was his testimony in his affidavit. And, then they rebutted that by two people saying, two attorneys, he never said that. I was never in a room with him where we said that. And, to say that would be nonsensical. The judge never had a hearing on that, right? No. There was a hearing that he was going to have and then he said, we're not going to do the hearing. Let me talk about that for a second. Because, with respect to the hearing, I would respectfully submit that it's very important and crucial that Mr. Spring did not submit an affidavit, again, after Judge Hellerstein accused and saw, and his attorney admitted, that he backdated the rent increase applications. Had he testified before Judge Hellerstein, I'm not sitting in their shoes, but he would have had a very serious decision to make about whether or not to invoke his Fifth Amendment rights. And, he didn't, not only did he not testify, but he didn't even submit a second affidavit. He had his son submit it. So, I believe, it's not that they asked for him to testify. He said at the time, when Judge Hellerstein brought it up, that he had a back problem. And, he wasn't sure, his attorney wasn't sure whether he was going to show up. And then, he never put anything else in, and never asked to testify, and I would respectfully submit that we can tell why. The email to his attorney said he would show up for the deposition, and the attorney was the one who represented that he wouldn't show up. I'm talking about the hearing, not about the deposition, Your Honor. At the hearing, there was discussion before Judge Hellerstein about his back problem. Judge Hellerstein said, I believe this man lied. If he's willing to defraud the city and charge his tenants more money, he's willing to defraud other people. And then, he didn't put in another affidavit, and he didn't show up to testify. I would see that there's a very good reason why that happened. Let me return a moment to the size, to what you said. If we do this, aren't we saying that you can never dismiss a case? And, there are obviously some cases where we have upheld dismissal. What I want to know is whether those are cases where the amount of damages is that high, and where there is no question whatever about the validity of that amount of damages. See, what bothers me about this case, if this were a question of whether your client was or was not liable at all, and then there was a dismissal, and then you can say, well, you know, you never know, and these people were frauds or so on. What makes this case rather remarkable is that no one, you don't deny, indeed you'd offer, that about $300,000 are your responsibility. That's why I would just, it would seem to me that this is distinguishable. What I would say on that, Judge Calabresi, is to continue through the process and to actually have some kind of a factual determination on the merits of the damages attributable to the cell phone equipment. With this pervasive degree of fraud in the case, and fraud in terms of the behavior of the litigants, would itself be injurious to and not necessary, injurious to the integrity of the judicial system? I understand that. That's a different argument from the argument you were making earlier, that if we decide that this is improper, we are saying that you can never dismiss. And I was just suggesting- I agree with that. I agree with that. You're right. I would say that here, with the pervasive degree of the fraud, to require Judge Hellerstein to have to conduct a trial for someone who's already so clearly offended the judicial system, lied in statements to the city, lied in terms of the initial documents that were submitted in connection to the damage of this case. In my view, Your Honor, and I don't sit where you are, that would do great damage to the judicial system. This is a good place to stop. Thank you. Thank you. We'll hear from KMB. Two minutes, sorry. Good morning, Your Honors. Joyce Boyle from the law firm of McIlroy, Deutsch, Mulvaney, and Carpenter on behalf of non-party appellee KMB Design Group, LLC. I have a very brief argument to make. As an initial matter, in the appeal papers filed by the appellant, the appellant made no argument as to the order granting fees in favor of KMB. So it's our position that it's not properly before the court. If the court is to, excuse me, is inclined to consider it, we're joining the arguments of T-Mobile. And it depends solely on, your friends on the other side do point out that the arguments that you make in your brief as to why you might be entitled to sanctions otherwise, other than for the issues with respect to this appeal, were not considered by Judge Hellerstein. The basis of our response to their appeal, Your Honor, is that it was based on a fraud on the court, that it was pervasive, as counsel said, throughout the entirety of the litigation, and that Judge Hellerstein determined that the entire case was fraudulent from its inception. The background that we provided for the court was merely to underscore the bad faith actions of the counsel in bringing KMB into the case we were in for two years, and we're here today. We're a non-party to the case, and it was really informational for the court to give you background. You don't suggest that Judge Hellerstein used that to award sanctions against the plaintiff with respect to you, though? No, Your Honor. I have nothing further. Thank you. Thank you. Mr. Lee, you're reserved three minutes for rebuttal. Thank you, Your Honor. Let me begin with Goodyear. Goodyear, as pointed out in the Supreme Court, arose out of a conflict among the Ninth, Fourth, Seventh, and Eighth Circuits. To the best of our knowledge, and T. Bobel has not cited anything to the contrary, there was no law of the Second Circuit directly on point with respect to the but-for causation standard that is now embodied in Goodyear. And so, therefore, when the U.S. Supreme Court issues new law on something that is directly germane to the issue, it seems to me that the only minimally appropriate result for this court is to vacate the order and remand to . . . You said New York. You mean U.S. Supreme Court. I apologize, of course. . . . with respect to . . . the minimally appropriate relief in this instance is to vacate the district court's order and remand for further consideration in accordance with the Goodyear decision. I agree with Your Honor that it is extreme in this case to award all of the attorney's fees that are since the commencement of the case to the other side. And in order to qualify under the Goodyear, the district court would have to make a but-for analysis and show that but for the commencement of the case, none of those fees would have been incurred. The district court would have to find that the settlement that but for the sanctionable conduct, a settlement for all of what was properly attributed to defendants' damages had been offered and, therefore, the whole litigation turned on what was sanctionable, assuming that it was sanctionable at all, of course. But assuming that, they claim that the district court in fact so found, I'm not so sure, but I suppose it could be that they already found it. I don't believe that the district court has clearly made that finding, Your Honor, and I suppose it is true that the district court could do that. I also do not believe that it is clearly the case in the record that we can be sure that the case would, in fact, have settled before the complaint was filed. I think there is some dispute about that. There was no hearing on damages, right? There was no testimony by experts on the amount of damages that was caused by T-Mobile. That is absolutely correct. In fact, expert discovery has not even commenced. So the court would have to find that the offer that was made was commensurate with the actual amount of damage and would have to have a damage hearing at a minimum, right? At a minimum. And with respect to the question about whether an evidentiary hearing was held before the imposition of the sanction in this case, as Your Honor pointed out, he did schedule a hearing. He did mention the importance of having a hearing at the oral argument on the sanctions motion, and the next day he issues an order canceling the evidentiary hearing, and he writes this, which is a little confusing. The evidentiary issue as to responsibility between plaintiff and plaintiff's past and current counsel shall be deferred until after the merits of the case are adjudicated. And the reasonable conclusion from that is after the complete adjudication on the merits of the case, which, as we know, did not actually happen in the normal course. That evidentiary hearing on the sanctions issues was never held, and the judge went ahead and made his decision. With respect to the point made by opposing counsel about the fact that Virginia properties would be receiving some sort of windfall because of rent increases, there's absolutely no evidence in the record to suggest that the amount of the increased rent from the rent stabilization would approach the total damages suffered by Virginia properties as a result of the collapse of the internet. There's simply no evidence in the record. It's pure speculation. And it's also hard to believe that the increases in rent on the rent stabilization would accrue to this sizable amount of money. With respect to comments about the attorneys, the prior trial counsel, all three of them for Virginia properties, all agreeing that Virginia properties are liars. I take exception with this, and I think that if you look closely at the affidavits that were filed by all three law firms, you will see that what those law firms are saying, and I'm going to specifically refer to Mark Creed. He was the first attorney of record. Says that he was not aware of any fraud during the course of his representation, but based upon the April order issued by the judge, he says, well, I didn't know anything about that. The judge says that they're liars, they're liars, but that's not something that he had personal knowledge of. And Lama Barnofsky says something similar. The third lawyer, Cibella. The fact that they were on the hook, if they said that they had done it, doesn't mean that what they are saying isn't relevant to whether it was your client who did something wrong. That is, yeah, they were defending themselves, and so we may be more skeptical of what they said, but it doesn't mean that one can't read what they're saying, as Judge Hellerstein did, to say that I conclude that your client did something wrong. You are correct, and I would agree with that, but I was saying something in addition to that, which is that none of the lawyers are testifying that they actually have direct personal knowledge of what lies told by the client. I wasn't saying that. Okay. I just want to make that point. It is relevant to whether there was some basis for Judge Hellerstein's finding sanctionable. Yes, and with respect to the ---- And because there was no hearing, they were never subject to cross-examination, for example, with respect to the statements that they were making. That is correct. And with respect to the third attorney, Mr. Cibella, who also was not sanctioned, Mr. Cibella went a step further than that. He said even based on everything that he now knows about the case, with the late produced state and city filings, with everything else, he concludes that this is not a basis for him to abandon the action, and he thought that in good faith he was able to continue pursuing the action. So that is a particularly relevant point about whether or not there is fundamentally a fraud at work here and whether there is enough evidence to find that there is a fraud on the court. The last thing that I wanted to go to were comments about the Yen testimony, because it really does serve as an underpinning of the court's belief, which is mistaken, that there is testimony in the record that brick pointing, waterproofing, and lintel work are totally unrelated to any damage caused by T-Mobile, and they keep citing to Mr. Yen. But if you review the Yen deposition testimony, he never actually says anything of the sort. There are questions, for example, about whether T-Mobile had anything to do with the rear wall, and Mr. Yen answers no, no, they didn't have anything to do with the rear wall. There are other questions about observational aspects of the building and whether those things that surrounded the building had something to do with T-Mobile. But Mr. Yen doesn't say this sort of penultimate statement, which is there's absolutely no waterproofing, brick pointing, or lintel work that is caused by T-Mobile. He simply doesn't say that. And so relying on that to draw a connection between two sets of documents and using that to conclude that one must be fraudulent is an extraordinary thing for this court to do and totally improper in our opinion. And at a minimum we need some expert proof on that. No question about it, Your Honor. At a minimum we need expert proof. Thank you. Thank you, Your Honors. Thank you both. We'll reserve decision.